UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY STAPLES,

      Plaintiff,                        Case No. 2:20-cv-11629
                                           District Judge Sean F. Cox
v.                                     Magistrate Judge Kimberly G. Altman

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.      Introduction

      This is a social security case.  Plaintiff Anthony Staples brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act).  Both parties have filed motions for summary judgment (ECF Nos. 15, 17), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

1

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Staples is not disabled under the Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 17) be GRANTED, Staples's Motion for Summary Judgment (ECF No. 15) be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.     Background

### A.     Procedural History

Staples applied for DIB and SSI benefits in April 2017, with an alleged onset date (AOD) of March 19, 2013, but at the administrative hearing he amended his AOD to June 25, 2017.  (ECF No. 11-2, PageID.90).  He was born on September 19, 1992, making him 24 years old at the time of his amended AOD. (ECF No. 11-5, PageID.292).  He had previously filed a claim on January 23, 2014, that was denied by another ALJ on August 7, 2015.  (ECF No. 11-2, PageID.90).

Staples attended one year of college and has prior work experience as an store laborer, production line worker, and collection clerk.  (*Id*., PageID.99; ECF No. 11-6, PageID.366).  He alleged disability due to "atrial fibrillation, atrial

tackycardia, orthostatic hypotension syncope,[1] left leg tendonitis, severe

depression, anxiety, chronic complex migraines, comprehensive disability, sleep

apnea, [and] poor circulation."  (ECF No. 11-6, PageID.365) [sic throughout].

After Staples's applications were denied at the initial level on April 10,

2018, he requested an administrative hearing, which was held on April 9, 2019

before the ALJ.  (ECF No. 11-2, PageID.90).  Staples testified at the hearing, as

did a vocational expert (VE).  (*Id*.).  The ALJ asked Staples whether he had

experienced any changes in his health from the time of the last decision, to which

Staples replied that he suffers recurrent blackout spells that were not due to atrial

fibrillation, unlike his prior blackout spells which were.  (*Id*., PageID.112).  These

blackout spells occur approximately twice per week, but he recently suffered three

on one day, and their cause was unknown at the time of the hearing.  (*Id*.,

PageID.113-114).  A blackout can last Staples anywhere from ten minutes to two

hours, during which he breathes and his heart performs normally.  (*Id*.,

PageID.116).  Staples avoids swimming due to the blackouts, though he went

swimming once last year.  (*Id*., PageID.120).  Despite this, Staples drove himself to

[1] Syncope is "the medical term for fainting or passing out.  It is caused by a temporary drop in the amount of blood that flows to the brain." https://my.clevelandclinic.org/health/diseases/17536-syncope (last accessed August 5, 2021).

3

the administrative hearing, and had never passed out while driving.  (*Id.*, PageID.123).  The blackout spells caused Staples to quit his part time work at Panera Bread and Uber.  (*Id.*, PageID.128).

Staples testified that he would not be able to perform even a sedentary job that involved being on the phone with a headset because the stress level could trigger his heart palpitations.  (*Id.*, PageID.135-136).  In a non-stressful position, Staples "might be able to do a job like that except for the passing out."  (*Id.*, PageID.137).  Sometimes Staples has a "good week" without any blackouts, but never longer than one week.  (*Id.*).  Due to his heart issues and allergy to adhesives, Staples currently had an implanted heart monitor, which reflected normal results even when he suffered a blackout.  (*Id.*, PageID.147).

The VE then testified, stating that under the RFC from Staples's prior decision, which restricted him to light work, no climbing, and no exposure to workplace hazards, he could perform the collections clerk position as typically performed.  (*Id.*, PageID.151).  With additions to the hypothetical RFC that mirror the assessed RFC as detailed below, the VE found that Staples could still perform the collections clerk position as typically performed, and could also perform the positions of information clerk, office clerk, and stock clerk.  (*Id.*, PageID.151-152).  If a claimant with that RFC also had to be off-task for at least 20% of the workday

4

in addition to regularly scheduled breaks, due to Staples's blackout symptoms, the VE stated that such a claimant would be excluded from competitive employment. (*Id.*, PageID.152). In the VE's experience, employers would not tolerate more than 15% of off-task time in the workday. (*Id.*).

Staples's wife Amber also testified at the hearing, stating that she has seen Staples pass out quite often after looking pale. (*Id.*, PageID.155). She testified that she did not notice a difference between these blackouts and those Staples suffered prior that were heart-related. (*Id.*, PageID.157). She noted that he has fallen down from passing out before, but never directly onto the floor, and that when she feels his heart beating during a blackout, she can "hear it going nuts." (*Id.*, PageID.158-159).

On April 30, 2019, the ALJ issued a written decision finding that Staples was not disabled from the AOD through the date of the decision. (*Id.*, PageID.100). On April 27, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (*Id.*, PageID.38-44). Staples timely filed for judicial review of the final decision. (ECF No. 1).

### B.     Medical Evidence

On March 1, 2017, a few months before the alleged onset date, Staples visited the emergency room for chest pain over the past three days. (ECF No. 11-

7, PageID.459).  His history of atrial fibrillation with a cardiac ablation in 2013 was noted.  (*Id.*).  Examination revealed no acute respiratory distress, no tenderness of the chest wall, regular heart rate and rhythm, no murmur, strong and equal peripheral pulses, and no edema.  (*Id.*, PageID.460).  A bedside cardiac ultrasound showed good cardiac contractility and no evidence of pericardial effusion.  (*Id.*).

On March 9, 2017, Staples began seeing neurologist Umesh Verma, M.D., for treatment of headaches.  (*Id.*, PageID.438).  Staples complained of symptoms that last four to six hours, occur about once per week, and began several years ago. (*Id.*).  Dr. Verma found him to have a normal mental status upon examination, with normal cranial nerve testing and intact sensation.  (*Id.*, PageID.439).  Dr. Verma called for a brain MRI, carotid ultrasound, echocardiogram, and EEG, and started Staples on Trokendi XR, a name-brand version of the drug Topiramate.  (*Id.*).

Staples returned to Dr. Verma on April 20, 2017.  (*Id.*, PageID.440).  Staples stated that he suffered one occasion of right side numbness followed by a headache between his visits.  (*Id.*).  Dr. Verma's examination was again normal, and he increased Staples's Trokendi XR from 50mg to 100mg.  (*Id.*, PageID.441).  Dr. Verma also noted that Staples's brain MRI was essentially unremarkable.  (*Id.*).

Staples also began treatment with Mumtaz Memon, M.D., a cardiologist with Michigan Heart, on March 30, 2017. (*Id.*, PageID.534). Staples complained of having palpitations that occur at any time, last anywhere from a few seconds to a few minutes, and resolve spontaneously, with no associated dizziness, presyncope or syncope. (*Id.*). Staples denied having any exertional chest pain. (*Id.*). He returned to Dr. Memon on May 5, 2017, having underwent a stress echocardiogram in April that showed no evidence of coronary ischemia and normal left ventricular systolic function. (*Id.*, PageID.535). Staples had also had a 48-hour Holter monitor in April that showed no significant arrhythmias except PVCs and PACs, and that apart from atypical chest pain he had no significant sense of palpitations. (*Id.*). Subsequently, he did have palpitations which were also noted by his wife, along with an irregular heartbeat. (*Id.*). He had no further chest pain, paroxysmal nocturnal dyspnea, orthopnea, syncope, or near syncope. (*Id.*). Physical examination at this visit was entirely normal. (*Id.*, PageID.540-541). Dr. Memon recommended a 30-day event monitor to document underlying rhythm abnormalities with his symptomatology. (*Id.*, PageID.537).

Staples saw Dr. Memon again on July 3, 2017. (*Id.*, PageID.559). Dr. Memon noted that Staples's event monitoring from a month prior showed sinus tachycardia and no arrhythmias. (*Id.*). Staples complained of one occasion of

7

palpitations and two occasions of chest pain during that time, all of which Dr.

Memon found were related to his sinus tachycardia. (*Id*.). Staples had not had any

further significant palpitations. (*Id*.). Dr. Memon had no further treatment plans

other than a follow-up appointment in one year's time. (*Id*.).

The record also contains a CT scan of the head from June 9, 2017, showing

no acute intracranial process and no evidence of intracranial hemorrhage or acute

infarction. (ECF No. 11-7, PageID.586-587). The scan did however reflect

moderate to severe chronic bilateral sphenoid, bilateral maxillary and bilateral

ethmoid sinusitis. (*Id*.).

After an apparent gap in heart and headache treatment, Staples returned to

the emergency room on April 18, 2018, reporting a headache and left-sided head

pressure that had started twelve hours prior. (*Id*., PageID.577-578). He noted that

chest pains were normal for him and that they had been improving since onset.

(*Id*.). He also reported congestion, but no dizziness, sensory change, or focal

weakness, nor any other symptoms. (*Id*.). His physical examination was normal

other than ceruminous otitis[2] behind the left ear, nasal congestion, and pharyngeal

irritation. (*Id*., PageID.579). The physician noted possible upper respiratory

---

[2] Swelling of the ear canal. https://medical-dictionary.thefreedictionary.com/ceruminous+otitis (last visited August 5, 2021).

infection, mild sinusitis, or allergic symptoms as the possible cause, and

recommended conservative therapy of IV fluids with Reglan, Benadryl, and

Tylenol to see if it helps Staples's headache.  (*Id.*, PageID.581).

Staples saw Frank Pelosi, Jr. M.D., of the Electrophysiology Clinic at the

University of Michigan Medical Center on July 25, 2018, for consultation.  (ECF

No. 11-8, PageID.804).  He reported continuing symptoms that he attributed to

atrial fibrillation including chest pain and shortness of breath, also reporting

frequent blackout spells that occur approximately twice per month.  (*Id.*,

PageID.810).  He reported having a brief moment of lightheadedness and vertigo

for five to ten minutes before losing consciousness, which would last from ten

minutes to two hours.  (*Id.*).  He also reported having palpitations, diaphoresis, and

shortness of breath occurring three times per week, and lightheadedness twice per

week lasting thirty minutes to one hour.  (*Id.*).  On physical examination, Staples

had normal results, with no jugular vein distention, no carotid bruits,[3] intact

peripheral pulses, no edema, and no murmurs, gallops, or rubs.  (*Id.*).  Due to

Staples's issues with adhesives, Dr. Pelosi recommended an implantable loop

---

[3] "A carotid bruit is a vascular sound usually heard with a stethoscope over the carotid artery because of turbulent, non-laminar blood flow through a stenotic area. A carotid bruit may point to an underlying arterial occlusive pathology that can lead to stroke."  https://www.ncbi.nlm.nih.gov/books/NBK536913/ (last accessed August 5, 2021).

monitor to identify potential arrhythmic sources for his symptoms.  (*Id*.,
PageID.811).  Staples agreed and the implantation was scheduled, occurring on
August 10, 2018.  (*Id*., PageID.688-689, 811).

Staples presented to the emergency room again on July 29, 2018, reporting
an episode of chest "squeezing," room-spinning dizziness, shortness of breath,
diaphoresis, nausea, and syncope.  (ECF No. 11-7, PageID.570).  Staples reported
persisting but mild chest discomfort and stated that he frequently has these
symptoms, experiencing approximately two syncopal episodes per month.  (*Id*.).
On examination, Staples had normal results, including normal heartrate and rhythm
and no murmur.  (*Id*., PageID.571).  He was discharged the same day.  (*Id*.,
PageID.574).

After implantation of his heart monitor, Staples was seen again at the
University of Michigan Medical Center on October 24, 2018.  (ECF No. 11-9,
PageID.864).  The examining nurse practitioner noted that despite experiencing
syncope, Staples's monitor showed no atrial fibrillation or any arrhythmia
associated with the event.  (*Id*., PageID.865).  Physical examination was normal,
and an EKG showed a heart sinus rhythm of 80 beats per minute.  (*Id*.,
PageID.866).

10

Regarding his mental health impairments, Staples was treated on a few occasions for depression and anxiety by Zulfiqar Ahmed, M.D., at Healthy Minds. *See* ECF No. 11-7, PageID.447-453, 489-508.  At his first visit on March 22, 2017, Staples reported that he had been feeling depressed for about six months.  (*Id*., PageID.450).  He would not want to get up or leave the house, had frightening dreams, and reported more depressed days than normal ones.  (*Id*.).  Mental status examination revealed Staples to have a normal appearance with fair hygiene, cooperative behavior, good eye contact, alert and oriented, a depressed and irritable mood and affect, no suicidal or homicidal thoughts, and adequate fund of knowledge.  (*Id*., PageID.451).  He also had a linear, goal directed, logical, and coherent thought process; intact memory; and fair concentration, insight, and judgment.  (*Id*.).  He was diagnosed with major depressive disorder and general anxiety, as well as panic attacks, and prescribed Lexapro and Xanax.  (*Id*.).  At his next visit on April 19, 2017, Staples reported feeling a lot better, with an improved mood, better energy, no bad dreams and no crying spells.  (*Id*., PageID.447). Staples continued to be treated at Healthy Minds on a monthly basis throughout 2017, with no major changes to his condition or medications.  (*Id*., PageID.489-508).

On January 24, 2018, Staples began treatment at Ambulatory Behavioral Health, stating that he was doing fairly well on Lexapro and lose-dose Xanax for almost one year but needed a new prescriber. (ECF No. 11-8, PageID.757). At intake, his psychiatric and physical exam results were entirely normal, including a calm and content mood and good insight and judgment. (*Id*., PageID.760). He was seen there on four more occasions throughout 2018. (*Id*., PageID.761-782). In June, he ran out of Lexapro for a few days and felt down, but was doing well again after getting it refilled. (*Id*., PageID.768). In September, he reported for the first time that he had side effects of sedation and groggy mood from his medications, and that a friend had benefitted from switching to Buspar. (*Id*., PageID.773). He was subsequently taken off of 10mg of Lexapro, weaned off of Xanax, and started on 5mg of Buspar. (*Id*.). In December 2018, Staples reported no issues with the change in medications, having a good mood and good overall anxiety control, though reporting some issues with falling asleep. (*Id*., PageID.778). Throughout 2018, Staples had normal examination results, including insight that reflected a full appreciation of his clinical condition, and judgment reflecting that he was fully engaged with care. (*Id*., PageID.765-780).

III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the

claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. §§ 404.1520, 416.920); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Staples was not disabled under the Act. At Step One, the ALJ found that Staples had not engaged in substantial gainful activity from the AOD to the date of the decision. (ECF No. 11-2, PageID.93). At Step Two, the ALJ found that Staples had the severe impairments of positional orthostatic tachycardia syndrome (POTS), history of atrial fibrillation, and syncopal episodes. (*Id.*) At Step Three, the ALJ found that Staples's impairments, whether considered alone or in combination did not meet or medically equal a listed impairment. (*Id.*, PageID.96).

The ALJ then assessed Staples's residual functional capacity (RFC), concluding that he was capable of performing light work with the following additional limitations:

14

> [H]e can climb no ladders, ropes or scaffolds.  The claimant can
> occasionally climb ramps or stairs.  He must avoid even moderate
> exposure to extreme cold, heat, humidity, environmental irritants and
> poorly ventilated areas.  The claimant must avoid exposure to
> unprotected heights and moving machinery.

(*Id.*).

At Step Four, the ALJ found that Staples was able to perform his past relevant work as a collections clerk as it is generally performed, based in part on testimony provided by the VE in response to hypothetical questions.  (*Id.*, PageID.99).  Alternatively, at Step Five, the ALJ found that Staples was able to perform other jobs such as information clerk, office clerk, and stock clerk that exist in significant number in the national economy.  (*Id.*, PageID.99-100).  As a result, the ALJ concluded that Staples was not disabled under the Act.  (*Id.*, PageID.100).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g). The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)). An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 582 F.3d 647, 651 (internal quotations omitted).

## V.    Analysis

### A.    Staples's Brief

Before turning to the merits of Staples's claim, the Court will address the brief filed by Staples's counsel, Patrick M. Carmody, Jr.  As the Commissioner

notes, Carmody's brief is underdeveloped to such an extent that any argument

made therein could be considered waived.  "[I]ssues adverted to in a perfunctory

manner, unaccompanied by some effort at developed argumentation, are deemed

waived. It is not sufficient for a party to mention a possible argument in the most

skeletal way, leaving the court to ... put flesh on its bones."  *McPherson v. Kelsey*,

125 F.3d 989, 995-996 (6th Cir. 1997) (citation and internal quotation marks

omitted).

The 35-page brief in support of Staples's motion for summary judgment

contains 31 pages of procedural history, including 25 pages of "summary" of

testimony at the administrative hearing.  Carmody then dedicates approximately

two pages to argument, stating that "[i]t is absolutely clear that Mr. Staples suffers

from numerous underlying medical conditions which are documented in the

medical record" without a single citation to any of the 453 pages of said record.

(ECF No. 15, PageID.940).  It is not the Court's duty to sift through the record in

search of evidence to support Staples's claims.  *See Sharp v. Comm'r of Soc. Sec.*,

No. 5:14-CV-12829, 2015 WL 5729090, at *6 n.9 (E.D. Mich. Sept. 30, 2015)

(citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007)).

Carmody also states that "the Administrative Law Judge did not discuss the effect

18

of the migraines." (ECF No. 15, PageID.939).  This is plainly false.  In finding

Staples's migraines to be a non-severe impairment, the ALJ stated as follows:

> The medical records establish that the claimant has migraines, which
> the undersigned finds to be non-severe impairment.  It has no more than
> minimal impact on the claimant's ability to work.  In June 2017, the
> claimant and Dr. Verma reported that the claimant's migraines were
> adequately controlled.  Dr. Verma noted that the claimant had normal
> neurologic exam and only needed to have follow up visits once a year
> (Exhibit B5F).  The claimant did not report any difficulties from
> migraines at the hearing.

(ECF No. 11-2, PageID.94).

Carmody has been cautioned more than once that "his failure to cite

evidence on his client's behalf is sanctionable and could lead to a referral to

Michigan Attorney Grievance Commission for investigation." *Getz v. Comm'r of

Soc. Sec.*, No. 18-CV-11625, 2019 WL 2710053, at *3 (E.D. Mich. June 10,

2019), *report and recommendation adopted*, 2019 WL 2647260 (E.D. Mich. June

27, 2019).  In *Swank v. Comm'r of Soc. Sec.*, No. 18-CV-13353, 2020 WL

1139717, at *4 (E.D. Mich. Mar. 9, 2020), the court noted that "[t]he 'Argument'

portion of Swank's twenty-five-page brief [submitted by Carmody] spans only two

pages and primarily consists of perfunctory, over-generalized arguments and

citations to law without any meaningful attempt at factual or legal analysis or

19

citations to the record evidence."[4]  Carmody was later warned again that "such

perfunctory efforts, as demonstrated here and in the cases cited above [*Getz* and

*Swank*], do not show proper respect for judicial economy or the needs of the client,

and may result in sanctions or disciplinary action by the Court if substantial

improvement is not shown in the future."  *Aun v. Comm'r of Soc. Sec. Admin.*, No.

19-CV-11143, 2020 WL 5223323, at *5 (E.D. Mich. Aug. 3, 2020), *report and

recommendation adopted sub nom. Aun v. Comm'r of Soc. Sec.*,  2020 WL

5209366 (E.D. Mich. Aug. 31, 2020).

The Court also takes notice of other cases in which Carmody has presented

underdeveloped arguments that were subject to waiver.  *See Hayes Comm'r of Soc.

Sec.*, No. 11-CV-14596, 2013 WL 766180, at *7 (E.D. Mich. Feb. 4, 2013);

*McAllister v. Comm'r of Soc. Sec.*, No. 19-CV-13587, 2021 WL 646195, at *2–3

(E.D. Mich. Feb. 1, 2021), *report and recommendation adopted* ,2021 WL 634630

(E.D. Mich. Feb. 18, 2021); *Frazier v. Saul*, No. 20-CV- 10321, 2020 WL

7338562, at *7 (E.D. Mich. Dec. 14, 2020); *Smith v. Comm'r of Soc. Sec.*, No. 17-

CV-13367, 2018 WL 7364646, at *12 (E.D. Mich. Oct. 26, 2018), *report and

recommendation adopted* , 2019 WL 700096 (E.D. Mich. Feb. 20, 2019).  The

---

[4] That court also noted that Carmody had already been warned of sanctions in *Getz*,
but that the filing of his brief in *Swank* preceded that warning.  *Swank*, at *4 n.2.

Court once again warns Carmody again that his failure to cite evidence on his client's behalf can lead to disciplinary proceedings and sanctions.

Staples's specific arguments are deemed waived for the reasons above. However, the Court is "loath to simply reject claims and prejudice claimants with potentially meritorious claims." *Id*. at *3. The Court has therefore reviewed the record and found that the RFC is supported by substantial evidence.

B.     Staples's Arguments and Independent Review of the Record

In his brief, Staples focuses on his testimony regarding recurrent "blackout spells" that are alleged to occur twice per week, last anywhere from ten minutes to two hours, and have an unknown cause. (ECF No. 11-2, PageID.112-116). The VE testified that if these blackouts would cause Staples to be off-task for 15% or more of the workday, he would not be suitable for competitive employment, rendering him disabled under the rules. (*Id*., PageID.152). Staples also testified that employment in a stressful job could cause him to suffer heart palpitations, but that in a non-stressful work environment, the only thing keeping him from working would be the blackouts. (*Id*., PageID.135-137). The ALJ considered the testimony, but found Staples's subjective symptoms regarding his blackout spells to be "not entirely consistent with the medical evidence and other evidence in the record." (*Id*., PageID.97).

21

The Social Security Regulations establish a two-step process for evaluating a claimant's subjective symptoms, including pain. 20 C.F.R. § 404.1529(a); SSR 16-3p. According to Social Security Ruling ("SSR") 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it – formerly termed a "credibility" determination – can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged pain, considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6)

any means used to relieve pain; and (7) other factors concerning functional

limitations.  20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

An ALJ's subjective symptom evaluation is given great weight and should

not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379

(6th Cir. 2001).  At the same time, "such determinations must find support in the

record."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).

Finding that Staples's testimony regarding blackout spells was not consistent

with the record, the ALJ noted that the record was replete with normal findings

upon physical examination and objective medical testing.  (ECF No. 11-2,

PageID.98).  The ALJ specifically noted a normal March 2017 cardiac ultrasound

(ECF No. 11-7, PageID.459-460), normal April 2017 stress echocardiogram (*Id.*,

PageID.535), event monitors in April and June 2017 that showed no arrhythmias

(*Id.*, PageID.535, 559), and a June 2017 CT of the head revealing no issues (*Id.*,

PageID.586-587).  *See* ECF No. 11-2, PageID.98.  The ALJ also noted that an

examination by Lisa Gilbert, M.D., in December of 2017 revealed respiration and

cardiac exams within normal limits, as well as a normal neurological exam.  (ECF

No. 11-2, PageID.98 (citing ECF No. 11-7, PageID.527-531).  The ALJ went on to

note Staples's normal results upon examination by Dr. Pelosi in July of 2018 (ECF

No. 11-8, PageID.804-810), his lack of atrial fibrillation and arrhythmia shown by

23

his heart monitor on October 19, 2018 (ECF No. 11-9, PageID.864-865), and his normal EKG on October 24, 2018 (*Id*., PageID.866). *See* ECF No. 11-2, PageID.98.

The ALJ also found some inconsistencies with Staples's subjective claims. For instance, though Staples testified to suffering blackouts approximately twice per week, and rarely going longer than a week without one, he told Dr. Pelosi that he had blackouts no more than twice per month. (ECF No. 11-2, PageID.94). This is also the rate that Staples reported to the emergency room physician in July 2018. (ECF No. 11-7, PageID.570).[5] Furthermore, the ALJ noted that despite blackout spells that reportedly came without warning, Staples continues to drive regularly and drove himself 33 miles to the administrative hearing and that his wife did not have an issue with him doing so with her and their children in the vehicle. (ECF No. 11-2, PageID.97-98). The record and testimony reflect that Staples was advised it was against Michigan law to drive within six months of a syncopal event, and that Staples has ignored that advice. (*Id*.). It was not improper for the ALJ to consider Staples's driving in assessing the consistency of his subjective

---

[5] The Commissioner contends that Staples stated in October of 2018 that he suffered blackouts only once per month, citing (ECF No. 11-9, PageID.865). (ECF No. 17, PageID.959). But this claim appears to be related to Staples's migraines, not his blackout spells. In any event, the ALJ did not rely on this evidence to discount Staples's subjective symptoms.

claims.  *See Morr v. Comm'r of Soc. Sec.*, 616 F. App'x 210, 212 (6th Cir. 2015)

(finding ALJ's adverse credibility determination was properly based in part on

contradictions between the claimant's alleged medical complaints and her own

activities, which included driving); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

532 (6th Cir. 1997) (finding that the ALJ acted properly when he took into account

that claimant could "run all of his errands, walk two miles, prepare all of his meals,

and drive three times a week").

"In evaluating a claimant's reported symptoms, ALJ's are *required*

to consider the symptoms' consistency with the broader record, including objective

medical evidence and other claimant testimony."  *Grandowicz-Racz v. Comm'r of*

*Soc. Sec.*, No. 18-11993, 2019 WL 4071921, at *3 (E.D. Mich. Aug. 29, 2019)

(emphasis added) (citing 20 C.F.R. § 404.1529(c)(3)).  The ALJ has done so here,

and upon independent examination of the record by the undersigned, his analysis is

found to be supported by substantial evidence.

As noted above, the ALJ considered Staples's headaches – despite Staples's

assertion to the contrary – finding them to be a non-severe impairment.  A severe

impairment is one that "significantly limits [the claimant's] physical or mental

ability to do basic work activities."  § 1520(c); § 920(c).  An ALJ who finds that

any of a claimant's impairments is severe must "consider the limitations and

25

restrictions imposed by *all* of an individual's impairments, even those that are not severe." *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018) (internal quotations omitted).  Because all impairments are to be considered "in the remaining steps of the disability determination, any perceived failure to 'find additional severe impairments at step two does not constitute reversible error.' " *Id.* (quoting *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007)) (internal quotations omitted).  If the ALJ properly considers the impairment in the subsequent steps of the disability determination, any error at step two is harmless and the court need not decide whether the ALJ erred in failing to find that the controversial ailment constituted a severe impairment.  *Id*.

In finding Staples's headaches non-severe, the ALJ considered records from Dr. Verma, who prescribed Topiramate 50mg to Staples in March 2017 and increased the dosage to 100mg in April 2017.  (ECF No. 11-2, PageID.93; ECF No. 11-7, PageID.438-441).  In July 2017, Staples reported to Dr. Verma that his headaches were adequately controlled, and Dr. Verma advised him to follow up "once a year or so," which is not indicative of a severe impairment  (ECF No. 11-7, PageID.482-483).  The ALJ also noted Staples's emergency room visit for a headache that was found to be likely related to respiratory infection, sinusitis, or allergies.  (ECF No. 11-2, PageID.94; ECF No. 11-7, PageID.577-581).  Staples

did not complain of headaches during his testimony, stating that his heart

palpitations and blackout spells were the reasons he could not work.  (ECF No. 11-

2, PageID.94).  Based on this, the ALJ found that Staples's headaches had no more

than a minimal impact on his ability to work and were thus non-severe.  (*Id*.).

There is no error apparent in this analysis.

Though unchallenged by Staples, the Court has also considered his mental

impairments of depression and anxiety.  These were also found to be non-severe by

the ALJ due to no greater than mild limitations in the following four functional

areas: (1) understanding, remembering, or applying information; (2) interacting

with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or

managing oneself.  (*Id*., PageID.95).  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1

(eff. March 27, 2017 to August 21, 2017).  In making these findings, the ALJ

considered Staples's subjective reports that he could drive, handle his finances, and

did not need special reminds to take care of personal needs and grooming.  (*Id*).

He also considered the psychological consultative evaluation by Craig Brown,

Ed.D.  (*Id*., PageID.94-95; ECF No. 11-7, PageID.513-524).  Dr. Brown reported

that Staples had normal grooming, hygiene, speech, thoughts, mood, and affect,

and that Staples could recall five digits forward, five digits backward, and three out

of three objects after a delay of time.  (ECF No. 11-2, PageID.94; ECF No. 11-7,

PageID.520-522).  Dr. Brown ultimately found that Staples was not impaired in the areas of understanding, remembering, or applying information and concentrating, persisting, or maintaining pace, and mildly impaired in his ability to interact with others and adapt or manage oneself.  (ECF No. 11-2, PageID.98; ECF No. 11-7, PageID.523).  The ALJ found this opinion to be persuasive as it was generally consistent with the record.  (ECF No. 11-2, PageID.98).

The ALJ also considered the opinion of Edward Czarnecki, PhD., a state agency psychological consultant, who opined on March 23, 2018, after reviewing the record to that date that Staples's mental impairments were non-severe.  (ECF No. 11-3, PageID.202).  The ALJ again found the opinion persuasive, as it was explained thoroughly and supported by medical evidence.  (ECF No. 11-2, PageID.98).  There are no medical opinions of record indicating that Staples suffered more than a mild limitation in any of the four functional areas.

The ALJ's conclusions regarding Staples's mental impairments are supported by substantial evidence in the record.  Although he was treated for depression and anxiety throughout 2017, his mental condition was stable and unremarkable upon receiving and taking medications.  *See* ECF No. 11-7, PageID.447-453, 489-508.  In January 2018, he began treatment at Ambulatory Behavioral Health, but only because he needed a new medication prescriber, and

he reported that he was doing fairly well on his medications.  (ECF No. 11-8, PageID.757).  He only felt "down" when he did not have his medications refilled, (*Id*., PageID.768), and upon reporting side effects of sedation and grogginess he was switched from Lexapro to Buspar without issue (*Id*., PageID.773, 778).  As noted by the ALJ, Staples consistently had good hygiene, grooming, insight, and judgment, and a normal mood.  (ECF No. 11-2, PageID.95).  Throughout his treatment at Ambulatory Behavioral Health in 2018, his insight reflected a full appreciation of his clinical condition and his judgment showed that he was fully engaged with care.  (*Id*., PageID.765-780).

Having examined the record, the undersigned finds that the RFC is supported by substantial evidence and that Staples's non-severe impairments are unlikely to have more than a minimum impact on his ability to work.  The ALJ's subjective symptom evaluation was also supported by substantial evidence, as the ALJ properly noted the lack of support for Staples's subjective statements in the record as well as inconsistencies within his statements.  There is no "compelling reason" to disturb this analysis, as it finds strong support within the record.  *Smith*, 307 F.3d at 379; *Rogers*, 486 F.3d at 247.

## VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that the

Commissioner's motion be GRANTED, Staples's motion be DENIED, and that

under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be

AFFIRMED.

Dated: August 9, 2021                               s/Kimberly G. Altman
Detroit, Michigan                                    KIMBERLY G. ALTMAN
                                                     United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 9, 2021.


s/Marie E. Verlinde
MARIE E. VERLINDE
Case Manager